PAN-AMERICAN PETROLEUM CORPORATION *et al. v.* PATE.

(Division B. March 3, 1930.)

[126 So. 480. No. 28400.]

(Division B.  June 2, 1930.)

[128 So. 870.  No. 28400.]

Wells, Jones, Wells & Lipscomb, of Jackson, Lloyd J. Cobb, of New Orleans, La., and Friday & Windham, of Booneville, for appellants.

J. A. Cunningham, F. W. Cunningham, J. S. Finch, and Lacy & Lacy, all of Booneville, for appellee.

828

■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■

Argued orally by **H. S. Lipscomb** and **Lloyd Cobb**, for appellant, and by **J. A. Cunningham**, for appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

Dexter Pate, by his guardian and next friend, sued the Pan-American Petroleum Corporation, J. M. Brown, and E. G. Senter, for a personal injury to the said Dexter Pate occasioned by the explosion of a can containing kerosene, or gasoline, or a mixture thereof, by which the child was severely injured. Among other injuries the child was burned about the face.

It was the theory of the plaintiff that the Pan-American Petroleum Corporation was operating a business in which J. M. Brown and E. G. Senter were employed as agents for the purpose of selling the products of the company, kerosene, gasoline, and other products. The facts are too lengthy and complicated to set out in detail, and, in view of the conclusion we have reached, it will not be necessary to set out extensively a statement of the case.

It appears that the method of doing business was that the Pan-American Petroleum Corporation owned certain instruments for the handling and selling of its products, and that J. M. Brown was placed in charge thereof, and that he made sales and daily reports of sales with daily remittances of the sales to the office of the company at Jackson, Mississippi, and that at the end of the month the company would remit Brown a commission on the sales so made. It also appears that, when the property used in connection with the business had to be replaced, or returned to any point, orders were given to Brown, and he sent it to the places directed by the company. The

company furnished Brown with report blanks and various instructions with reference to the business, and shipped its products to certain points for Brown to dispose of, and Brown would, after emptying the tanks and containers, return them to the point where directed assigned to the company. A great mass of evidence was introduced in the nature of correspondence and instructions, sales reports, and reports or sale tickets, used by the delivery man in selling its products which recited: "Received payment. Pan-American Petroleum Corporation, by ———, Agent." Senter, as delivery man, was required to sign this report, and these reports were sent into the Jackson office at stated times.

It was the theory of the appellants that Brown was an independent contractor and not an agent or servant of the company. Among the things introduced in evidence to establish the agency of Brown was the liability policy taken out for the benefit of the company and Brown. It appears further in the record that Senter, in making sales, sold to certain sawmill people, and certain tractors and truck users, mixed kerosene and gasoline for fuel for the tractors and trucks instead of operating them entirely with gasoline. It appears that for those uses the mixture was better and cheaper than gasoline. Among the persons to whom products were sold by the delivery driver was a man by the name of McCauley. A sale had been made to him in December near the middle of the month, and from McCauley, the father of Dexter Pate purchased some kerosene on the 31st of December. Pate and a number of other persons who purchased during the period had trouble with the kerosene, it being explosive and having exploded in a number of lamps owned by customers of McCauley.

It appears that on the morning of the 9th of February Mr. Pate went into a room with some material to make a fire, and poured some of the fluid from the can into the fireplace where the fuel had been placed, and looked around for a match, but found none. About that time

Pate's wife, who was in an adjoining room and who was sick, called him, and he told the child, Dexter Pate, and a sister of his, a young lady about sixteen years of age, to kindle the fire. Dexter Pate procured some fire coals and placed them in the fireplace, and the young lady was fanning them in order to light the fire when the explosion occurred. It was shown that the can was several feet from the fireplace. As stated above, the child was burned and injured; among other injuries, and in addition to the above stated, was an injury to the thorax gland which, it is claimed, resulted in making the child exceedingly nervous and in arresting mental and bodily growth; that afterwards the burned child could not control himself under excitement and was extremely excitable, and that his mind was impaired.

It was testified by the plaintiff that after the injury the oil that was in the lamps was taken from them and placed in a fruit jar, and that afternoon, after the injury in the morning experiments were made by pouring some of the kerosene, or mixture, on the ground and applying matches, and that it would flash some distance before the match reached the place where the oil was poured; that is to say, at a distance of several inches. This mixture which was placed in the fruit jar was retained by Pate for several months and was then turned over to his attorney who carried it to the State University and had it analyzed and tested. The mixture was found to be nineteen per cent gasoline and eighty-one per cent kerosene on said test, and the testimony shows that a mixture in this proportion is dangerous for the uses which kerosene is generally used. There was testimony for the defendant attempting to show that Pate had bought gasoline a day before the injury from another party than McCauley; that on this occasion he had stalled and found that it was due to being out of gasoline—some persons coming along testified to that fact—and that he took a can and went to a store nearby and purchased gasoline. Pate denied that his can was used in such purchase, and

denied that the can which contained the kerosene mixture at the time of the explosion was used on that occasion, and also testified that the purchase was made after the explosion.

It is complained that the court erred in admitting the liability policy upon the truck operated and making the sales referred to above. This testimony was introduced for the purpose of showing that Brown was an agent, and that the Pan-American Petroleum Corporation was principal; and it was admissible under the case of Finkbine Lumber Company v. Cunningham, 101 Miss. 292, 57 So. 916, and is distinguishable from Herrin et al. v. Daly, 80 Miss. 341, 31 So. 790, 92 Am. St. Rep. 605. In this last-named case the evidence was admitted on a liability policy in a case where the question of principal and agent did not arise, and it was not admitted for the purpose of showing agency or the relation of the principal in connection with other evidence upon that proposition.

As stated above there was a great mass of evidence having a tendency to show that the relation of principal and agent existed between Brown and the Pan-American Petroleum Corporation. Among other things introduced was the issuance of a license tag for the truck, and the peddler's license for the privilege of selling the products was taken out in the name of the Pan-American Petroleum Corporation. It is contended that, while this was true, yet Brown was charged with the amount of this, and that the amount was deducted from his commissions. But it also appears that this practice of charging to Brown did not continue through the relation. It is next contended that the court erred in not giving each of the defendants a peremptory instruction.

We have carefully considered the entire evidence and have reached the conclusion that there is sufficient evidence to go to the jury, and the jury may, if they believe the facts favorable to the plaintiff, find a verdict for the plaintiff against each of the defendants. The testi-

mony upon this point is too elaborate and voluminous to set out, and it would unduly lengthen this opinion.

Among the evidence to establish liability against Senter was a written statement that he had made to the attorney for the plaintiff, subsequent to the injury, which the court excluded as to Brown, and as to the Pan-American Petroleum Corporation, but admitted it to establish liability against Senter. In this statement he admitted facts which would make him liable.

The testimony as to whether Brown was an independent contractor was conflicting, and the jury was warranted in believing from the course of dealing and the instructions and correspondence that he was an agent of the Pan-American Petroleum Corporation, and not an independent contractor.

Before the trial began the appellants moved for a change of venue, predicated upon section 500 of Hemingway's 1927 Code (section 707, Code of 1906), which provides that: "If a citizen resident in this state shall be sued in any action, not local, out of the county of his household and residence, or if a public officer be sued in any such action, out of the county of his household and residence, although a surety or sureties, or some of the sureties, on his bond, or other joint defendant, sued with him, be found or be subject to action in such county, the venue shall be changed, on his application, before the jury is impaneled, to the county of his household and residence."

It is conceded by the appellants that the case of Dean v. Brannon, 139 Miss. 312, 104 So. 173, appears to uphold the court's ruling on the motion of Brown and Senter for a change of venue, but it is urged that this case was decided on May 11, 1925, while the amendment did not come into effect until February 24, 1926. Counsel say: "We must confess that there appears to be some ambiguity in the amendment. It is difficult to determine whether the phrase although 'other joint defendant, sued with him, be found or be subject to action in such county,'

applies simply to public officers or to resident citizens in general.'' The purpose of the amendment was to change the rule announced as to public officers sued out of the county, although residence and official duties call for their presence there, and because a surety on their bond, or some other defendant jointly liable resides in another county. The evil that the statute designed to remedy was taking the officer away from his jurisdiction, and thus interfering with the administration of his official duties. This is a sufficient distinction to classify officers into an exception giving them a right to have the venue moved back to their county, because the public interest might often suffer by the absence of the officer from the place where his duties call him to act in behalf of the public. Such exception is not a discrimination.

There is an assignment of error predicated upon a communication which reached the jury room, being a note to one of the jurors from his wife; but in view of the conclusion we have reached it is not necessary to decide this question, as it will not likely occur on another trial. The case must be reversed, however, for the giving of the following instruction for the plaintiff: ''The court instructs the jury for the plaintiff that if you find for the plaintiff in this case, it is your sworn duty under the law to award the plaintiff damages against either or all of the said defendants against whom you may find that will, from a preponderance of the evidence, fully compensate him for injuries, including any and all mental pain and suffering endured up to the present or which he may reasonably be expected to suffer in the future as a proximate result, and also for any humiliation or embarrassment that he has or may reasonably be expected from the proof to endure on account of his scars or deformed condition, and for any loss of earning capacity he may reasonably be expected to sustain from the proof on account of any physical or mental impairment during his life from the time of his majority, and any nine of you may return a verdict as the verdict of the jury.'' It was error

to give that part of the instruction which, reads: "And also for any humiliation or embarrassment that he has or may reasonably be expected from the proof to endure on account of his scars or deformed condition." The principle of this instruction was condemned in Bonelli et al. v. Branciere, 127 Miss. 556, 90 So. 245, and J. J. Newman Lumber Company v. Norris, 130 Miss. 751, 94 So. 881. It was pointed out in these cases that the party was not entitled to recover as actual damages compensation for disfigurement of the person, unless such disfigurement was accompanied by pain, and that after the pain ceased the right to recovery for disfigurement and humiliation was not recoverable as an element of actual damages. The instruction above quoted falls quite within the condemnation of these cases, and for it the judgment must be reversed, and the cause remanded for a new trial for damages alone.

Reversed and remanded.

### On Suggestion of Error.

**Griffith, J.,** delivered the opinion of the court on suggestion of error.

We have carefully re-examined the questions raised by this appeal and are satisfied with the conclusions heretofore reached; and we add to the original opinion only to make it clear that there was no intention to leave the impression that a harmful communication reaching a jury would be considered as error only on the amount of the verdict and not also on the issue of liability, as appellants suggest could be inferred from our former opinion. What we have to say on this subject, as applied to this case, is as expressed by the circuit judge: "The note shows on its face that it had no reference to the case and couldn't influence anybody. . . . The case is not mentioned in the note and it has not been shown that the writer had any interest in the case." The testimony

showed further that, within reason, the note could not have been the transmission of a message in code, nor could it have carried any meaning except in regard to the stated business affair needing attention at home, about which the wife, who wrote it, desired advice from her husband, the juror to whom it was directed. It was error, of course, for the note to be allowed, without the knowledge of the judge, to get to the juror, and the bailiff who permitted it was amenable to censure. But if it had first been handed to the circuit judge, as it should have been, 12 Ency. Pl. & Pr., p. 622, and he had, after a careful examination of it, allowed it to be given the juror, there would not have been reversible error, if error at all, in view of the fact that the note contained nothing even of remote reference to the case; and the finding of the judge to that effect on the motion for a new trial has the same effect as if, so finding on examination, he had permitted the communication in the first instance. 46 C. J., p. 138; 12 Ency. Pl. & Pr., pp. 609, 610; 2 Thomp. on Trials, section 2553.

Appellants seem to think also that, in failing specifically to mention the matter in our former opinion, we have held it immaterial or harmless that a communication was allowed to reach the jury that defendant had before trial offered twenty thousand dollars in settlement of the case. The only way that any such question has come into this record was by the following interrogatory propounded to the juror Breedlove on the motion for a new trial: "Mr. Breedlove, did any communication reach the jury from the outside while the jury was deliberating or at the noon hour to the effect that the defendant had offered twenty thousand dollars in settlement of this case?" The court sustained an objection to the interrogatory and declined to permit the juror to answer. There is no assignment in the motion for a new trial, nor was there any evidence introduced which would form a sufficient predicate for that interrogatory. The only predicate laid in the motion for a new trial was that

the father-in-law of one of the jurors had been "permitted to converse with said juror," but there is no specification whatsoever in the motion for a new trial as to what that conversation was. So far as alleged, it may have been of some simple news of the health of the family. Moreover, the father-in-law denied any conversation of any character, and that denial stands uncontradicted in the record. To permit interrogatories to jurors such as the above without a sufficiently specific predicate well laid in the motion, and laid too within those limits wherein jurors may be interrogated at all, would be to allow motions for new trials to be turned into fishing expeditions among the jurors on the mere chance of catching something upon which the verdict might be impeached; whereas it is but axiomatic to say that all judicial procedure is founded upon the principle that allegation must first be sufficiently made and that the search for the proof thereof must precede the hearing—save only as to that which is obtained on cross-examination, and even this must be reasonably within the allegations.

Suggestion of error overruled.