522 So.2d 195 (1988)
Elaine G. FRUCHTER,
v.
LYNCH OIL COMPANY.
No. 57334.
Supreme Court of Mississippi.
February 3, 1988.
Rehearing Denied April 13, 1988.
*196 S. Allan Alexander, Patterson, Tollison & Alexander, Oxford, for appellant.
H. Scot Sgragins, S.T. Rayburn, Sumners, Hickman & Rayburn, Oxford, for appellee.
Before HAWKINS, P.J., and ROBERTSON and GRIFFIN, JJ.
ROBERTSON, Justice, for the Court:

I.
Today's personal injury case turns on the rule of respondeat superior. The Circuit Court summarily resolved the issue against plaintiff after discovery had failed to establish the defendant gasoline distributor's control over its service station operator's employees. On appeal, we have carefully reviewed the record and points of law. We affirm.

II.

A.
Because of our procedural posture we state the facts favorably to the Plaintiff-Appellant.
Elaine G. Fruchter was a dancer and choreographer at the University of Mississippi. On August 17, 1984, she was filling the tires of her bicycle with air at the By-Pass Shell, a service station operated by Robert E. (Bud) Keel. An automobile drove up to the station side of the pump island. The driver requested a station employee, James (Ike) Leeton, to check the water in the radiator as it had overheated. Leeton noticed Fruchter and asked her to move to the street side of the pumps which she did. Leeton then removed the pressure cap. When he did so, in spite of his ostensibly cautionary instructions to Fruchter, hot water was blown onto her back, shoulders, neck and right arm causing severe *197 and painful burns. Fruchter alleges temporary and permanent personal injuries.
Fruchter has sued Keel d/b/a By-Pass Shell and, as well, Lynch Oil Company. Lynch Oil's relationship to what happened August 17 is our primary concern this day.
Lynch Oil Company is a closely held family corporation chartered in the state of Mississippi. The company serves as a distributor for Shell Oil Company, among other businesses. By-Pass Shell Service Station is situated on South Lamar Avenue just north of the Highway 6 Bypass. The real property and improvements at By-Pass Shell are owned by George Lynch, Jr., and George Lynch, III, both stockholders in Lynch Oil. The underground gas reservoirs and the pumps at By-Pass Shell are owned by Lynch Oil.
Lynch Oil has owned or controlled the land, ground and buildings of By-Pass Shell for more than fifteen years but has never operated the gas station. Rather, Lynch Oil leases the pumps, tanks, land and building to the operator who under an oral agreement pays $1,000 a month and purchases gasoline daily. The operator "sets his own prices," "hires his own people," "buys gas and some oil from [Lynch Oil]," but buys other items, e.g., filters and tires, from whomever. Lynch Oil supplies the station with all gasoline, more or less on a consignment basis, and the operator pays for the gas on a daily basis, keeping as a profit the difference between the wholesale price and the retail price.
Robert E. (Bud) Keel began operating By-Pass Shell in 1983 pursuant to this arrangement. Ike Leeton was employed by Keel who paid his salary and directed his work activities.
Lynch Oil required that Keel keep By-Pass Shell open seven days a week. Beyond this Keel was required to operate the station as a Shell gas station and display only Shell signs. Shell Oil dealt directly with Lynch Oil. All credit card sales were routed through Lynch Oil with credit back from Shell Oil, rather than going directly from By-Pass Shell to Shell Oil.
The oral lease from Lynch to Keel contained no termination provisions. George Lynch, president of the corporation, understood that the corporation could terminate the lease if it was dissatisfied with the way Keel was operating the station and also that it had the right to approve or refuse any sale of the operating business by Keel to a third person. In fact, subsequent to the events involved here, Keel sold the business to Bill Curtis. Curtis came and asked if Lynch would object to doing business with him. "After investigating and thinking about and giving it some thought, I felt like I would [lease the station to Curtis]," Lynch stated. Keel could sell his part to anyone he desired, but it was not a foregone conclusion that Lynch Oil would lease to that person; however, Lynch stated, that problem never came up. In Curtis' case, he bought Keel out before he discussed the lease with Lynch.
While Lynch Oil doesn't pay for the By-Pass' license or utilities, the light bill is in Lynch Oil's name as a big deposit is required. When the bill was first put in Lynch's name, no deposit was required; the lessee, though, pays for all electricity used by writing a check that Lynch sends to the electric company.

B.
Fruchter commenced this civil action by filing her complaint in the Circuit Court of Lafayette County, Mississippi, on March 11, 1985.
Fruchter's amended complaint sought $200,000 and named Bud Keel and Lynch Oil Company as defendants  Lynch Oil in its relationship as principal to agent Keel or, in the alternative, as Keel and Lynch were joint venturers in the operation of By-Pass Shell. Lynch Oil moved for summary judgment on the basis that no principal/agent relationship existed nor was Lynch Oil in a "joint enterprise, venture or partnership" with Defendant Keel.
On January 28, 1986, the Circuit Court granted Lynch Oil's motion and dismissed it from the suit. The Court further certified that there was no just reason for delay of entry of final judgment on the claim against Lynch Oil Company. See Rule *198 54(b), Miss.R.Civ.P. The case against Keel, of course, remains viable insofar as the record reflects.
The case is now before us on Fruchter's appeal seeking reversal of the judgment entered summarily in favor of Lynch Oil Company.

III.
The core issue is whether Lynch Oil Company had sufficient control over Ike Leeton that Lynch should in law be responsible for Leeton's negligent conduct. The Circuit Court resolved the issue summarily in favor of Lynch Oil. See, Rule 56(c), Miss.R.Civ.P. We may affirm only if we find from the record that on the control question there was no genuine issue of material fact and that Lynch Oil was entitled to judgment as a matter of law. Brown v. Credit Center, Inc., 444 So.2d 358, 362 (Miss. 1983).
Construction and enforcement of the provisions of our Rule 56 have been detailed in a number of cases beginning with Brown. Those need not be repeated here. One nuance of recent vintage ought be noted. The burden of producing evidence in support of or in opposition to a motion for summary judgment is a function of our rules regarding the burden of proof at trial on the issue in question. See Galloway v. Travelers Insurance Company, 515 So.2d 678, 683 (Miss. 1987).[1]
Our pre-Galloway cases have recognized that Rule 56 does not cast upon the movant any burden of proof beyond that which he would shoulder at trial. What we say is that the movant has the job of persuading the court, first, that there is no genuine issue of material fact and, second, that on the basis of the facts established, he is entitled to judgment as a matter of law. See, e.g., Pargo v. Electric Furnace Co., 498 So.2d 833, 835, 836 (Miss. 1986); Smith v. Sanders, 485 So.2d 1051, 1054 (Miss. 1986).
We have referred to the movant's burden as one of production and of persuasion, not of proof. Brown v. McQuinn, 501 So.2d 1093, 1095 (Miss. 1986); Shaw v. Burchfield, 481 So.2d 247, 252 (Miss. 1985). Celotex and Galloway make clear that this latter point is in need of refinement. The movant has the burden of production only where at trial the movant would have the burden of proof.
In today's case Fruchter at trial would have the burden of proving facts sufficient to establish Lynch Oil's responsibility for Leeton's negligence. She therefore had the burden of production of evidence showing a genuine issue of material fact at the summary judgment hearing. She had the burden of producing evidence which, if believed, would establish Lynch Oil's control of, or right to control, Leeton's work.
This is wholly consistent with our oft stated premise that the party against whom a motion for summary judgment has been made must respond with diligence. She remains silent at her peril. For one thing, the non-movant may not rest upon allegations or denials in her pleadings. Mere allegation of a material fact in one's pleadings is not sufficient to generate an issue of fact sufficient to avoid summary judgment. Smith v. Sanders, 485 So.2d 1051, 1054 (Miss. 1986); Hill v. Consumer National Bank, 482 So.2d 1124, 1128 *199 (Miss. 1986). Rather, the party opposing the motion must by affidavit or otherwise set forth specific facts showing that there are indeed genuine issues for trial. Matter of Lanius, 507 So.2d 27, 30 (Miss. 1987); Smith v. First Federal Savings & Loan Association, 460 So.2d 786, 792 (Miss. 1984).
These thoughts in mind, we turn to the law regarding Lynch Oil's alleged liability and then apply that law to the facts before us, viewed most favorably to Fruchter.

IV.
One who acts through another is in law himself the actor. Slaughter v. Holsomback, 166 Miss. 643, 659, 147 So. 318, 322 (1933). If B while acting on A's behalf commits a tort, A may be liable. This is the simple theory on which Fruchter has sued Lynch Oil. She says Lynch Oil acted through Leeton, that Lynch Oil is legally responsible for Leeton's negligence.
Our cases in the field revolve around the idea of control. The right to control is as important as de facto control at the tortious moment, for the right to control the work of another "carries with it the correlative obligation to see to it that no torts shall be committed" by the other in the course of the work. White's Lumber & Supply Co. v. Collins, 186 Miss. 659, 672, 191 So. 105, 106 (1939). Our question thus is not what Lynch Oil did but what it may have done on August 17, 1984. Kisner v. Jackson, 159 Miss. 424, 430, 132 So. 90, 92 (1931).
On the other hand, Lynch Oil is not in law responsible for injuries caused by Leeton if Leeton was free of Lynch's will  "actually and substantially free of his control." Kisner v. Jackson, 159 Miss. at 428, 132 So. at 91. There is another fact premise sometimes pointing to non-liability: If the party situated as was Lynch Oil, is concerned only with ultimate results and not the details of Leeton's work.
These general principles are familiar enough. They inform somewhat our search for whether one is a servant or an independent contractor.
Fruchter tells us that Keel and hence Leeton are servants of Lynch Oil Company. Not surprisingly, Lynch Oil urges that Keel was an independent contractor. The argument of each proceeds upon the familiar assumption that the law's labels perform formalistic functions susceptible of application with mathematical precision. That there be core cases emitting easy answers fails to establish that there is any hard edged, case controlling, line of demarcation.
We have struggled with such matters for many years. At all points we have recognized that whether one is a servant or an independent contractor[2] is "a very elusive question." Gulf Refining Co. v. Nations, 167 Miss. 315, 330, 145 So. 327, 332 (1933). That is because the "juristic line between independent contractor and agent," Levine v. Standard Oil Co., Inc., In Kentucky, 249 Miss. at 651, 656, 163 So.2d 750, 752, is not a line at all but a twilight zone filled with shades of gray. Accepting the "limitations of language" we eschew all effort "to lay down a concise definition that will furnish any universal formula covering all cases." Kisner v. Jackson, 159 Miss. 424, 427-28, 132 So. 90, 91 (1931). Not that such a definition is not needed. It is simply beyond our capacity, for not only are we confounded by the "limitations of language"; the underlying realities are even more amorphous and elusive.
Still the question is one of law. We give our law that reading which best fits our prior cases in the field and best justifies those considered as a whole, and, having done so, we proceed "on principle." Gulf Refining Co. v. Nations, 167 Miss. 315, 330, 145 So. 327, 333 (1933). Decision of cases at the margin requires careful attention to the facts in light of the best statement of the principles embedded in and undergirding the legal notion that one may be responsible for the tortious acts of another.
*200 Fruchter relies heavily upon Gulf Refining Co. v. Nations, 167 Miss. 315, 145 So. 327 (1933). Fruchter points particularly to Gulf Refining's discussion of control in a setting where the agent, Wilkins, hired and fired employees, fixed their compensation and paid them for their services. Gulf Refining holds that the oil company
had equally as large a power over Wilkins' helpers as had Wilkins, for under the contract appellant had a right to cancel it for any cause it deemed sufficient. That right, of course, necessarily carried with it, if exercised, the discharge of Wilkins and all of his employees.
167 Miss. at 329-30, 145 So. at 332.
A year later, however, in a similar case this Court said:
The power of either party to the contract to terminate it at will, standing alone, is not a controlling element, ... .
Shell Petroleum Corporation v. Linham, 163 So. 839, 840 (Miss. 1935). Shell Petroleum unfortunately neither discusses nor even cites Gulf Refining. Shell Petroleum, however, has itself been cited with approval repeatedly, most recently in Levine v. Standard Oil Company, Inc. In Kentucky, 249 Miss. 651, 163 So.2d 750, 751 (1964).
None of these cases fit today's case on its facts. Suffice it to say that Gulf Refining had considerably more control over Wilkins, see Gulf Refining, 167 Miss. at 326, 145 So. at 331, than Lynch Oil did over Leeton. On the other hand, Lynch Oil seems to have had somewhat more control over Keel and hence Leeton than Standard Oil did over Hearon, see Levine, 249 Miss. at 654, 163 So.2d at 751, than Shell Petroleum did over Young, Shell Petroleum, 163 So. at 839.
The facts before us fail to reflect any authority on Lynch Oil's part to terminate Keel at will. As operator of By-Pass Shell, Keel paid Lynch $1,000 per month in addition to daily gas purchases. This suggests a month to month tenancy. Lay v. Great Southern Lumber Co., 118 Miss. 636, 79 So. 822, 824 (1918); see also Miss. Code Ann. § 89-7-23 (1972).
George Lynch, III, President of Lynch Oil, described the company's relationship with Keel without contradiction as follows:
A. Okay. The dealer, the person we lease to, pays for the gas daily. He sets his own price, he hires his own people, he provides his own insurance, he provides  he buys gas and some oil from us. He buys filters and tires and other related items from whoever he wants to buy it from. Ever who he wants to buy it from.
We don't have any control over the people that work for him. I've never written a check to anybody down there. I never have changed his price, I never suggested he does anything other than keep it open for the public and give good service. That's my part of what I've done down there.
... . We don't own anything as far as tire changers, his fan belts or anything. I don't know who works for him. I don't have a  I have never written a check to anybody down there, payroll. I never instructed anybody to do anything. And you will have to ask what you want to ask me. That's basically  I don't know exactly when he sold it to Bill Curtis, I don't know what he got for it. I didn't get any money. We didn't, the oil company. I didn't receive any compensation from anybody down there. And he sold it and we leased it to Bill Curtis under the same terms that we did to Bud Keel.
This translates into an inescapable factual and legal reality: Lynch Oil had no meaningful control over Leeton in the performance of his work on August 17, 1984. Lynch Oil had no legal authority to control Leeton. Leeton was actually and substantially free of Lynch Oil's will.
There is another point that merits mention. Several recent cases have recognized apparent control as an important step toward liability via respondeat superior.
If a party holds itself out as offering services to the public and if consumers are reasonably led to believe that they are doing business with that party, a private undisclosed agreement may not be used to thwart a plaintiff's action. So in Elder v. *201 Sears Roebuck & Company, 516 So.2d 231, (Miss. 1987), we held Sears liable, notwithstanding its side agreement with its authorized agent, because Sears, in addition to indicia of control, induced members of the public doing business with the agent to believe that they were doing business with Sears. Hardy v. Brantley, 471 So.2d 358 (Miss. 1985), involved a suit against Hinds General Hospital for the negligence of its emergency room staff. Hinds General had a private contract with emergency physicians like unto Sears' contract with its agent in the Elder case. Hinds General put the emergency physicians in a position to deal with the public which had no knowledge of the private agreement which purported to exempt Hinds General from liability for the physicians' torts. In these circumstances, we held Hinds General liable for its emergency physicians' malpractice. Hardy, 471 So.2d at 372; see also Royal Oil Co., Inc. v. Wells, 500 So.2d 439, 447 (Miss. 1986).
On today's facts these cases might point the finger at Shell (although nothing said here should be taken as an indication how that question ought be decided if Fruchter sued Shell). The point for the moment is that this recent line of cases on principle suggests exoneration of Lynch Oil. Insofar as the record reflects, Lynch Oil did nothing which induced Fruchter to come upon the premises with the thought that she was doing business with it. Lynch Oil did nothing which in fact engendered Fruchter's reliance upon it as the party responsible for operating By-Pass Shell.

V.
In summary, we recall that the issue of control is one with respect to which Fruchter bore the burden of proof. Though she has taken depositions of George Lynch, III, and Bud Keel, she has failed to establish a factual premise upon which we might hold Lynch Oil had legal responsibility for Leeton's negligence.[3] On the issue before us, the record reflects no genuine issue of material fact and that Lynch Oil was entitled to judgment as a matter of law.
AFFIRMED
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P. JJ., and PRATHER, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
NOTES
[1] In Galloway we followed the construction placed upon the language of Rule 56, Fed.R. Civ.P., in Celotex Corp. v. Catrett, 477 U.S. 317, 322-324, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265, 273 (1986). See also Davis v. Davis, 508 So.2d 1062, 1066 (Miss. 1987); Millican v. Turner, 503 So.2d 289, 292 n. 3 (Miss. 1987). Federal Rule 56 is identical to our Rule 56. See also our recent cases recognizing that the quantum of proof required of the burdened party at trial informs the content of whether a showing of genuine issue of material fact has been made so as to avoid summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Sherrod v. United States Fidelity & Guaranty Company, 518 So.2d 640, 642 (Miss. 1987); Haygood v. First National Bank of New Albany, 517 So.2d 553, 556 (Miss. 1987); Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987). We have said from the outset that federal construction of Federal Rule 56 would be "persuasive of what our construction of our similarly worded rule ought to be." See Smith v. H.C. Bailey Companies, 477 So.2d 224, 233 (Miss. 1985); Bourn v. Tomlinson Interests, Inc., 456 So.2d 747, 749 (Miss. 1984).
[2] For a colorful (though dated) independent contractor parody, see McDonald v. Hall-Neely Lumber Co., 165 Miss. 143, 155-56, 147 So. 315, 317-18 (1933) (Griffith, J., dissenting).
[3] The record tells us nothing of what has become of Fruchter's action against Keel. Suffice it to say that nothing said here should be taken as suggesting how that action should be decided. Specifically, that we assume here that Leeton was negligent does not affect the litigation of that issue in Fruchter's claim against Keel.